UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL SAMMS,

                                   Plaintiff,
                                                        9:10-CV-0349
v.                                                      (GTS/GHL)

BRIAN FISCHER, LUCIEN J. LECLAIRE, JR.,
S.B. DUNCAN, NORMAN BEZIO, JAMES FERRO,
H. REINHOLD, MICHAEL HOGAN, MR. DROWN,
DALE ARTUS, S.E. RACETTE,
JOSEPH P. PORCELLI,

                                   Defendants.
_____

APPEARANCES:                          OF COUNSEL:

MICHAEL SAMMS, 07-A-4065
Plaintiff *pro se*
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN            CHARLES J. QUACKENBUSH, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff

Michael Samms alleges that Defendants violated his constitutional rights by placing him in

administrative segregation at Clinton Correctional Facility and retaining him in that placement for more than two years.  Currently pending before the Court is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Dkt. No. 44.)  For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I.    BACKGROUND

The following facts are taken from Plaintiff's complaint (Dkt. No. 1) and documents attached to the complaint[1] (Dkt. Nos. 1-1 and 1-2):

Plaintiff began serving his current sentence in the New York Department of Correctional Services ("DOCS") system on July 26, 2007.  (Dkt. No. 1 at 10[2] ¶ 17.)  He was housed in the general population at Downstate Correctional Facility.  *Id.* at 11 ¶ 19.

On January 11, 2008, Plaintiff was transferred to Clinton Correctional Facility.  *Id.* ¶ 21. Plaintiff was escorted directly to the Special Housing Unit ("SHU"), an area of the prison in which inmates are confined to a cell for twenty-three hours a day and deprived of many of the privileges that inmates in the general population enjoy.  *Id.* ¶¶ 24-28.  When Plaintiff asked the area supervisor and officers why he was being placed in the SHU, they told him they were "just following orders" from Defendant Dale Artus, Superintendent of Clinton Correction Facility.  *Id.* at 12 ¶ 30.

---

[1]    When determining whether a complaint fails to state a claim, a court may review exhibits attached to the complaint and any documents incorporated into the complaint by reference.  *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989)).

[2]    Page number references are to the page numbers assigned by the Court's electronic filing system.

Pursuant to a written order by Defendant Deputy Superintendent of Security S. E. Racette, Plaintiff was placed in a special cell, different from the other cells in the SHU, designed for inmates who had been found guilty of throwing feces and bodily fluids.  (Dkt. No. 1 at 12 ¶¶ 31-32, 34; Dkt. No. 1-1 at 1-4.)  The metal mesh wire and thick fiber glass shield across the front of the cell gate prevented much air from coming into the cell, causing it to be hot, stuffy, and dry. (Dkt. No. 1 at 12 ¶ 33.)  Plaintiff remained in the special cell until February 10, 2008, "although he never threw anything on a staff figure []or inmate, nor did Plaintiff ever have a misbehavior report or incident on his entire disciplinary history record that would constitute/warrant him being placed behind this special cell . . ."  *Id*. at 13 ¶ 35.

On January 12, 2008, Defendant S.B. Duncan, DOCS Senior Investigator, recommended that Plaintiff be placed in administrative segregation.  *Id*. ¶ 36.  In the DOCS system, inmates are placed in administrative segregation when it is determined that their "presence in general population would pose a threat to the safety and security of the facility."  N.Y. Comp. Codes. R. & Regs. tit. 7, § 301.4(b).  Pursuant to regulation, administrative segregation inmates housed in the SHU are "subject to the same rules and regulations as those disciplinary inmates who have completed 30 days of satisfactory adjustment."  *Id*. at (c).  Plaintiff asserts that inmates in administrative segregation cannot participate in religious worship or religious education classes, are limited to exercising one hour per day in a 9x14 cage, and cannot possess personal underwear or socks.  (Dkt. No. 1 at 26 ¶¶ 96-97.)  Many of the inmates in administrative segregation are seriously mentally ill, scream and bang on the cell walls, and smear feces on the walls and floors. *Id*. ¶ 97.

Defendant Duncan stated that his reasons for recommending administrative segregation

for Plaintiff were: (1) Plaintiff's conviction for first degree robbery, first degree assault, and

criminal possession of a weapon, for which he was serving a sentence of thirty-four to forty

years; (2) Plaintiff's guilty plea to a charge of first degree Promoting Prison Contraband; (3)

Plaintiff's accumulation of forty-four infractions, including eleven assaults on staff, while

confined at Rikers Island prior to entering DOCS; (4) Plaintiff's ability to slip from handcuffs; (5)

Plaintiff's disciplinary record during an earlier DOCS sentence at Downstate Correctional Facility

in 2001, when he accumulated three Tier 3 reports and six Tier 2 reports on charges ranging from

violent conduct and fighting to unauthorized organization; (6) Plaintiff's accumulation of thirty

infractions at Rikers Island in 2007, including three assaults on staff; (7) the discovery of a cell

phone and charger in Plaintiff's property at Rikers Island; (8) the 'considerable mention' of

Plaintiff by name in a 2007 New York Daily News article, which described Plaintiff as

"[t]opping the rogues gallery" in a list of sixty-five "violence-prone criminals who need extra

attention"; and (9) two 2007 Tier 2 reports. (Dkt. No. 1-1 at 5.) Defendant Duncan concluded

that Plaintiff:

> has proven himself to be a severe management problem. His ability
> to procure a cell phone while housed at Rikers Island [] indicates he
> has the connections to circumvent security and continue with his
> criminal behavior. This inmate is also seen as having a certain
> influence over other incarcerated individuals he affiliates himself
> with.

*Id*.

On January 22, 2008, Defendant Drown conducted an administrative segregation hearing.

(Dkt. No. 1 at 13 ¶ 37.) At the beginning of the hearing, Defendant Drown told Plaintiff not to

bother calling any witnesses or making too many objections because it would just "drag out the

hearing" and "it wouldn't matter anyway because he had a strict order to find Plaintiff guilty." *Id*.

¶ 39.  Defendant Drown told Plaintiff "not to worry, because judging by Plaintiff's . . .

disciplinary history . . . Plaintiff would only be held in Administrative Segregation Confinement

for approx[imately] six . . . months, then released to the Close Supervision Unit . . ., as he had

seen happen to another inmate . . . [who] had a very similar case and record as the Plaintiff's."  *Id*.

¶ 40.

        The hearing lasted forty-five minutes.  (Dkt. No. 1 at 14 ¶ 41.)  Plaintiff did not call any

witnesses or make too many objections.  *Id*.  During the hearing, Defendant Drown considered

the Daily News article to which Defendant Duncan had referred.  *Id*. ¶ 43.  The article stated:

> They're among the baddest of the bad, a scary crew of armed thugs
> who walked the city streets with violence on their minds and guns at
> the ready.  And now they're being shadowed by the NYPD.  A little
> more than a year after it was created, the city's gun offenders registry -
> the first in the nation - is tracking 65 felons, with hundreds expected
> to follow.  Of the registrants, 21 are out of jail.  And the offenders
> must begin reporting to the NYPD next month.  The registry -
> proposed by Mayor Bloomberg in January 2006, signed into law last
> summer and launched in March - isn't meant to mimic the public
> warning system of sex offender registries.  It's an internal NYPD
> roster of violence-prone criminals who need extra attention.
> Criminals land on the list when they're convicted of a weapons
> charge.  After they're released from prison, they must meet with cops
> every six months for four years.  Topping the rogues gallery is
> Michael Samms, 26 - a career criminal who blew apart a man's leg
> just for fun, the Daily News has learned.  Samms and a pal launched
> the August 2005 attack while riding around downtown Brooklyn in
> a silver Chrysler 300.  After spotting a couple who had just left a
> club, Samms jumped out of the car, pointed a 9-mm. Luger
> semiautomatic pistol at Eddie Battle Jr. and screamed, "Run your
> pockets!"  Battle hesitated.  Samms rifled through the man's pants,
> pulled out a wallet and got into the car.  Then - just for spite - Samms
> stepped out and shot Battle in the thigh, slicing his femoral artery and
> shattering the bone.  Samms was sentenced to 25 years in prison in
> July.

(Dkt. No. 1-1 at 8.)

At the conclusion of the hearing, Defendant Drown determined that Plaintiff should be placed in administrative segregation. (Dkt. No. 1 at 14 ¶ 43.) He stated that he relied upon Plaintiff's "significant record at the New York City D.O.C.S., and [a] newspaper article describ[ing] the Plaintiff as 'needing extra attention among a population composed exclusively of felons . . . .'" *Id*.

Plaintiff asserts that Defendant Drown acted arbitrarily and capriciously, noting in particular that "the article never stated: 'among a population composed exclusively of felons.'" *Id*. ¶¶ 43-44.

Plaintiff appealed Defendant Drown's disposition to Defendant Norman Bezio, the DOCS Director of Special Housing and Inmate Disciplinary Program. *Id*. ¶ 45. Defendant Bezio affirmed Defendant Drown's decision on March 13, 2008. *Id*. ¶ 46.

On March 23, 2008, Plaintiff sent a letter to Defendant Bezio asking him to reconsider his decision. (Dkt. No. 1 at 15 ¶ 47.) Plaintiff sent a carbon copy to Defendant Brian Fischer, the Commissioner of DOCS. *Id*. On March 31, 2008, Defendant Lucien J. LeClaire, the DOCS Deputy Commissioner of Correctional Facilities, responded to Plaintiff's letter. *Id*. ¶ 48. The letter, which was carbon copied to Defendant Artus, stated:

> Commissioner Fischer has asked me to respond to your letter to him concerning your confinement status in Administrative Segregation at Clinton Correctional Facility. Please be advised that Departmental regulations require that a hearing be conducted to assess the reason why the segregation of a specific inmate may be necessary. A hearing was conducted and due to the serious nature of the information contained in the Administrative Segregation recommendation, your placement in Administrative Segregation was warranted. It is noted that the decision of the hearing officer was affirmed on March 13,

> 2008.  The hearing was conducted appropriately in accordance with
> Departmental procedures.  Your Administrative Segregation[] status
> continues to be reviewed periodically to determine the need for such
> assignment.    At this time, your present placement appears
> appropriate.

(Dkt. No. 1-1 at 10.)

On April 4, 2008, Plaintiff wrote to Prisoner's Legal Services of New York regarding his

placement in administrative segregation.  (Dkt. No. 1 at 15 ¶ 49.)  On April 18, 2008, Prisoner's

Legal Services wrote to Defendant Bezio.  *Id*. ¶ 50.  The letter stated:

> Overall the recommendation for Mr. Samms' placement in Ad Seg
> seems like an overreaction, as it arose not by his behavior in state
> custody, but rather on the basis of a newspaper article.    The
> newspaper article . . . discusses a gun offender registry created by the
> NYPD for the purpose of tracking offenders upon release from
> prison.  CHO Drown notes that the article describes Mr. Samms as a
> "violence prone criminal needing extra attention."  Reliance upon this
> registry seems highly irregular and inappropriate here.  Moreover, it
> is clearly misplaced as it completely fails to consider the significant
> difference between needed "extra attention" while out on the street
> and warranting extremely restricting confinement while in prison.
> Gun violence and crime prevention and detection strategies on the
> street is one thing, appropriate custody placement within DOCS is
> quite another.   Indeed the only "extra attention" required by the
> registry is to meet with police officers every six months.  This pales
> in comparison to highly restrictive SHU confinement and all it
> entails, including the lack of programming.  As well, the reliance on
> Mr. Samms' conduct while in jail prior to entering state custody does
> not provide justification for his Ad Seg placement either.  Surely a
> maximum [security] state prison such as Clinton is much more secure
> than a city jail.    Indeed, this is evidenced by the  Ad Seg
> recommendation itself, which lists a total of 44 disciplinary
> infractions incurred during Mr. Samms' time on Rikers, as opposed
> to a total of 9 infractions (six of which were Tier II s) while in DOCS
> custody.   In addition, the city jail infractions appeared to have
> occurred within a two month period, yet the 9 infractions in state
> custody occurred over a two and a half year period.  Indeed, at the
> time this Ad Seg recommendation was made Mr. Samms had only
> received two Tier II tickets in the nearly six months he had been in

7

> state custody.  Clearly the diminished infraction rate in state custody
> reflects, at least in part, the enhanced security that NYSDOCS
> possesses, together with a qualitative difference in Mr. Samms'
> behavior and conformity with DOCS' rules and standards.  In short,
> Mr. Samms has not proven himself to be in need of Ad Seg
> placement in state custody.

(Dkt. No. 1-1 at 11-12.)

On May 13, 2008, Plaintiff wrote to Defendant Fischer regarding his placement in

administrative segregation.  (Dkt. No. 1 at 15 ¶ 51; Dkt. No. 1-1 at 13-16.)   Defendant LeClaire

responded to Plaintiff's letter.  (Dkt. No. 1 at 15 ¶ 52.)  He stated that:

> Commissioner Fischer has asked me to respond to your letter to him
> concerning your confinement status in Administrative Segregation at
> Clinton Correctional Facility.  It should be noted that the procedures
> to be followed with regard to inmates assigned to Administrative
> Segregation are established in Directive #4933, Chapter VI, Title 7,
> NYCRR.  All issues noted in your letter will also be considered as
> part of your next sixty-day review in Central Office.  I am forwarding
> a copy of your letter to Superintendent Artus at Clinton Correctional
> Facility for his information and any action deemed appropriate.

(Dkt. No. 1-1 at 17.)

On October 6, 2008, Plaintiff filed a grievance regarding unsanitary SHU conditions.

(Dkt. No. 1-2 at 31-32.)  He stated that "there is still human feces smeared all over the rec cages

that I am being placed in.  The feces are smeared on all of the rec cages - not one particular cage.

It has been this way for quite a while now (a few months) . . ."  (Dkt. No. 1-2 at 31.)

On October 7, 2008, Plaintiff filed a grievance regarding excessive noise in the SHU.

(Dkt. No. 1-2 at 33-34.)  He stated that the "loud and disturbing noise comes from all of the

serious mentally ill inmates that they (DOCS) have me around . . . . " *Id.* at 33.  He described the

noise as "constant screaming, yelling, banging on the walls and cell gates that goes on all day

thru-out (sic) a 24 hour period." *Id*. He also alleged that he had to "smell and breath[e] in the atrocious odor of feces being thrown . . . people not taking showers for weeks." *Id*. at 34.

During 2008 and 2009, a three-member facility committee consisting of Defendant Racette, Defendant Corrections Counselor Joseph P. Porcelli, and an unnamed person (the "facility committee") reviewed Plaintiff's administrative segregation placement every sixty days. (Dkt. No. 1 at 16 ¶ 55.) On November 17, 2008, the facility committee noted that Plaintiff was originally placed in administrative segregation because he:

> has been described in a newspaper article as a violence prone criminal needing "extra attention" among a population composed exclusively of felons. While awaiting trial and subsequent sentencing on Rikers Island, he accumulated 30 infractions including 3 assault[s] on staff. He was also found to possess a Nokia phone and charger on 5/17/07.[3]

(Dkt. No. 1-1 at 32.) The facility committee noted that Plaintiff "continues to comply with all policies and procedures at Clinton Correctional Facility. Samms has not been a management problem since being assigned to Clinton." *Id*. The facility committee concluded, however, that Plaintiff "continues to pose a threat to the safety and security of the facility if placed in General [P]opulation." *Id*.

The facility committee forwarded its recommendation to a Central Office committee consisting of Defendant Staff Inspector General James Ferro, Defendant Staff Counsel H. Reinhold, and Defendant Chairman of Facility Operations Michael Hogan. (Dkt. No. 1 at 16 ¶¶ 57-58.) On November 21, 2008, the Central Office committee found that:

---

[3]       This section of the facility committee's January 21, 2009, March 19, 2009, and May 13, 2009 reports was identical. (Dkt. No. 1-1 at 36; Dkt. No. 1-2 at 20, 29.)

While an inmate with the New York City Department of Correction (DOC) at Riker's Island, [Plaintiff] presented a persistent and serious safety threat. Inmate Samms collected at least 16 disciplinary infractions, including at least two for assaults on DOC staff, from October 2005 through March 2007. During an earlier period of incarceration at Riker's Island, April 1999 through January 2001, he amassed at least 32 disciplinary infractions, including at least nine for assaulting DOC staff. On May 15, 2007, Riker's Island found inmate Samms to be in possession of a Nokia cell phone and cell phone charger. On December 15, 2006, inmate Samms pled guilty to Promoting Prison Contraband in the 2nd as a result of his possession of a weapon in Riker's Island on September 18, 2006. On February 21, 2006, inmate Samms pled guilty to Assault in the 3rd and Obstruction of Government Administration in the 2nd as a result of his assault on DOC staff at Riker's Island on November 20, 2005. On June 29, 2000, inmate Samms pled guilty to Assault in the 3rd for his assault on DOC staff at Riker's Island on August 28, 1999. On September 27, 1999, inmate Samms pled guilty to Attempted Assault in the 3rd as a result of a physical altercation with DOC staff at Riker's Island that occurred on June 27, 1999. On January 4, 2001, inmate Samms pled guilty to Promoting Prison Contraband in the 1st as a result of the inmate's possession of a weapon (a sharp metal object hidden in his right sock) at Riker's Island on April 20, 1999. During inmate Samms' first period of incarceration with the New York State Department of Correctional Services (DOCS) that commenced on April 11, 2001, he accumulated three Tier III reports and six Tier II reports, for which inmate Samms was found guilty of charges including, but not limited to, Violent Conduct, Fighting and Unauthorized Organization. During inmate Samms' current period of incarceration with DOCS that began on July 26, 2007, he has received two Tier II reports and one Tier III report, for which he was found guilty of charges including, but not limited to smuggling, the exchange of a telephone pin number, and failure to follow a direct order. Inmate Samms' earliest release date is November 15, 2039, resulting from crimes that include Robbery in the 1st, Criminal Possession of a Weapon in the 2nd and Assault in the 1st. The incident that gave rise to these crimes included the gratuitous shooting by inmate Samms of a robbery victim, subsequent to the robbery, resulting in serious injury to said victim's leg. Finally, it should be noted that inmate Samms is a member of a violent unauthorized criminal enterprise. In light of the foregoing, it is clear that inmate Samms is a dangerous individual whose criminal acts did not abate upon his incarceration. He has, on multiple occasions, directed

> violence against security staff. Consequently, this Committee
> believes that inmate Samms' presence in a general population setting
> at any correctional facility would pose an undue risk to safety and
> security. The Committee therefore recommends the inmate's
> continued Administrative Segregation at this time.

(Dkt. No. 1-1 at 32-33.)

The Central Office committee forwarded its recommendation to Defendant LeClaire.

(Dkt. No. 1 at 16 ¶ 59.) On December 3, 2008, he found, "[b]ased on all the information," that

Plaintiff should remain in administrative segregation because his "release from Administrative

Segregation at this time would pose too great a risk to the safety and security of the facility."

(Dkt. No. 1-1 at 32.)

In December 2008, Plaintiff wrote to the Legal Aid Society regarding his administrative

segregation placement. (Dkt. No. 1 at 18 ¶ 68.) On January 13, 2009, the Legal Aid Society

wrote to Defendant Bezio, requesting that Plaintiff be released from administrative segregation

due to his good behavior. *Id*. ¶ 69; Dkt. No. 1-1 at 34.

On January 21, 2009, the facility committee found that Plaintiff "complies with all

policies and procedures at Clinton. Samms has not been a management problem in the year that

he has been assigned to Clinton. Samms has questioned if the Department believes he needs

closer monitoring than other inmates, if a placement in APPU or similar unit could be

considered." (Dkt. No. 1-1 at 36.) The facility committee concluded that "[a]lthough Samms

continues to pose a threat if placed in General Population, placement in restricted population

might be appropriate and would allow staff to closely monitor him." *Id*.

On January 23, 2009, the Central Office committee found that Plaintiff "is currently

serving a sentence of 34 1/3 to 40 years for the crimes of Robbery 1st[,]Assault 1st, and Criminal

Possession of a Weapon 2nd.  These crimes involved the gratuitous shooting by inmate Samms of

a robbery victim, resulting in grievous injury to the victim.  Inmate Samms' earliest release date

is November 15, 2039."  (Dkt. No. 1-1 at 36.)  The Central Office committee did not state

whether or not it recommended continuing Plaintiff's administrative segregation placement.

On January 23, 2009, Defendant LeClaire concluded, upon "review of all available

information," that Plaintiff's "retention in Administrative Segregation is necessary at this time."

*Id*.

On February 3, 2009, Plaintiff wrote to non-defendant Deputy Superintendent LaValley,

non-defendant Captain of Security Uhler , Defendant Racette, and Defendant Artus regarding his

administrative segregation placement.  (Dkt. No. 1 at 19 ¶ 71; Dkt. No. 1-1 at 37; Dkt. No. 1-2 at

1; Dkt. No. 1-2 at 3-8.)  Only Mr. LaValley responded.  (Dkt. No. 1 at 19 ¶ 71.)  He stated that he

did not "have the authority to release you from Administrative Segregation.  You may make a

statement regarding the need for continued administrative segregation, which will be considered

during the next scheduled review."  (Dkt. No. 1-2 at 2.)

On February 4, 2009, Plaintiff wrote to non-defendant Assistant Commissioner Donald

Selsky.  (Dkt. No. 1 at 19 ¶ 72; Dkt. No. 1-2 at 9-14.)  Mr. Selsky responded on March 9, 2009.

(Dkt. No. 1 at 19 ¶ 72.)  His response stated that Plaintiff's

> status is under regular review by a three-member Central Office
> committee in accordance with the provisions of Directive #4933.  I
> am not involved in such determinations.  You should continue to
> present your objections to your assignment by writing to the
> superintendent.  That information will be considered at the next
> regularly scheduled review.  Your positive adjustment is noted.  I
> encourage you to continue such efforts as you strive toward release
> from Administrative Segregation status.

(Dkt. No. 1-2 at 15.)  Mr. Selsky cc'd this letter to Defendant Artus.  *Id*.  Plaintiff wrote to Mr.

Selsky again on April 1, 2009.  (Dkt. No. 1 at 19 ¶ 72; Dkt. No. 1-2 at 16-18.)  Mr. Selsky

responded on April 21, 2009.  (Dkt. No. 1 at 19 ¶ 72.)  He stated that Plaintiff's

> positive overall adjustment while assigned to the Special Housing
> Unit under Administrative Segregation status is noted.  I encourage
> you to continue such efforts as you strive toward release from that
> assignment.  I have forwarded your letter to the Central Office
> Administrative Segregation Review Committee for their
> consideration at your next periodic review of your status.  I am
> confident that all relevant information will be considered at the time
> of that review.

(Dkt. No. 1-2 at 19.)  Mr. Selsky cc'd this letter to Defendant Artus, the Central Office

Administrative Segregation Review Committee, and the Central File.  *Id*.

On February 24, 2009, the Legal Aid Society wrote to Defendant LeClaire.  (Dkt. No. 1 at

18 ¶ 69.)  This letter was identical to the January 13, 2009, letter to Defendant Bezio.  (Dkt. No.

1-1 at 35.)

In March 2009, the facility committee recommended that Plaintiff be placed in a "closely

monitored population" rather than administrative segregation.  (Dkt. No. 1 at 19 ¶ 73.)  The

facility committee's report stated that Plaintiff "continues to comply with all policies and

procedures at Clinton.  Samms has not been a management problem . . . Samms continues to

question the Department[']s need to continue to hold him [in] Admin. Seg.  Samms has

questioned if he can be placed into another Unit that would monitor him closely."  (Dkt. No. 1-2

at 20.)  The facility committee stated that "[a]lthough Samms continues to pose a threat if

returned to General Population, placement in a closely monitored population may be

appropriate." *Id*.

On March 23, 2009, as it had in January 2009, the Central Office committee found that Plaintiff "is currently serving a sentence of 34 1/3 to 40 years for the crimes of Robbery 1st[,] Assault 1st, and Criminal Possession of a Weapon 2nd. These crimes involved the gratuitous shooting by inmate Samms of a robbery victim, resulting in grievous injury to the victim. Inmate Samms' earliest release date is November 15, 2039." (Dkt. No. 1-1 at 36.) The Central Office committee did not state whether or not it recommended continuing Plaintiff's administrative segregation placement. *See id.*

On April 1, 2009, Defendant LeClaire concluded, "[u]pon review of all available information, including all data as submitted by the facility and Central Office committees," that Plaintiff's "continued retention is needed at this time." (Dkt. No. 1-2 at 20.)

On April 13, 2009, Plaintiff filed a grievance regarding his continued confinement in administrative segregation. (Dkt. No. 1 at 20 ¶ 74; Dkt. No. 1-2 at 21-27.) CORC unanimously denied Plaintiff's grievance on June 17, 2009, because:

> CORC has not been presented with sufficient evidence to substantiate any malfeasance by staff. CORC upholds the discretion of the facility administration to place inmates in administrative segregation in order to maintain the safety and good order of the facility. CORC asserts that the appropriate performance of the review committee and enforcement of the rules and regulations should not be construed as punishment by the grievant.

(Dkt. No. 1-2 at 28.)

Plaintiff alleges that after he filed his grievance, the Central Office Defendants ordered the facility committee to stop recommending that Plaintiff be placed in a closely monitored population rather than in administrative segregation. (Dkt. No. 1 at 20 ¶ 76.) Thereafter, although again noting that Plaintiff "has not been a management problem," the facility committee

14

recommended that Plaintiff remain in administrative segregation. *Id.* ¶ 77; Dkt. No. 1-2 at 29. When Plaintiff asked the facility committee why they contradicted themselves this way, they replied that "they have to follow orders from the higher-ups" and that "if it were up to them . . . they would place the Plaintiff in their General Population . . . ." Dkt. No. 1 at 17 ¶ 63.

In May 2009, the Central Office committee noted that it had

> considered Inmate Samms' April 2009 letters to Assistant Commissioner Selsky, Ms. Bellamy and Commissioner Fischer. Inmate Samms wants Administrative Segregation to be moved from the SHU or for him to be released to APPU or GSU. He feels he is being unfairly disciplined when he has not engaged in misconduct, but has had good behavior. He wants more privileges. He feels the review process is unfair and prejudiced against him. He alleges the process uses false evidence and does not have enough evidence to hold him. He writes he is no longer a threat and Administrative Segregation takes a toll on him and his family. Samms is correct about his recent history of good behavior. He has no unusual incidents on file. Since coming to state custody in 2007, he had misconduct in September and November 2007 that led to two Tier II hearings and was engaged in smuggling in January 2008 that led to a Tier III hearing. He has not had a Tier hearing since the January 2008 smuggling charge. Samms is encouraged to continue his good behavior as he hopes to leave Administrative Segregation. However, the committee recommends he remain in Administrative Segregation at this time because of his long history of violence, especially his crimes and misconduct at Rikers Island, and because of his affiliation with an unauthorized criminal organization. Samms started his known criminal career in 1997 at 18 with a conviction for Attempted Criminal Sale of a Controlled Substance that led to a Youthful Offender adjudication and probation. He was convicted of Assault, First Degree, after he and two others brutally beat up a victim and cut his face and hand with a box cutter in February 1999. The victim required about 40 stitches. In August 2005, Samms shot and robbed a young man, which led to his current incarceration. He is serving 34 1/3 to 40 years for the crimes of Robbery, First Degree, Assault, First Degree, and Criminal Possession of a Weapon, Second Degree. His earliest release date is 2039. Samms has had a long history of problems in prison. In April 1999, he was found with a shank at Rikers Island. Between August 2001 and September 2003, he had six

15

> Tier II hearings and three Tier III hearings.  In 2006, he was found with a cell phone at Rikers Island.  Samms had over 40 infractions while at Rikers Island, including over 10 assaults on staff.  He was determined to be a severe management problem while housed at Riker's Island.  Inmate Samms' history of repeated violence, and especially assaults on Rikers Island staff, and his ability to obtain a cell phone at Rikers Island causes the committee great concern.  Samms' presence in general population poses an undue risk to the safe, secure and orderly operation of any correctional facility and, therefore, this committee recommends his continued Administrative Segregation at this time.   Note that pursuant to regulation, Administrative Segregation inmates must be housed in SHU.  Privileges for inmates housed in SHU are set by applicable directives and regulations.  This review committee is without authority to alter the regulation.

(Dkt. No. 1-2 at 29-30.)

On June 1, 2009, Defendant LeClaire concluded, "[b]ased on the information presented," that Plaintiff's "release from Administrative Segregation is not warranted at this time."  *Id*. at 29.

As of the date he filed the complaint in this action (March 25, 2010), Plaintiff had been confined to administrative segregation for twenty-two months.  (Dkt. No. 1 at 21 ¶ 79.)

Plaintiff alleges that Defendants violated his rights to equal protection and due process and his rights under the Eighth Amendment.  *Id*. at 22 ¶ 82, 26 ¶ 95.  Plaintiff accuses Defendants of conspiring against him.  *Id.* at 28 ¶ 101.  Plaintiff requests declaratory relief, an injunction ordering Defendants to release Plaintiff from administrative segregation and barring Defendants from "placing Plaintiff in any form of administrative confinement based on the allegation[s] that have been fraudulently used to confine Plaintiff," compensatory damages, punitive damages, and costs.  *Id*. at 28-31.

16

## II.     LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief."  *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct.

17

at 1949.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citation omitted).  Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint.  *See Advanced Marine Tech. v. Burnham Sec ., Inc.*, 16 F. Supp. 2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).  In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

## III.   ANALYSIS

### A.   Procedural Due Process Claim

Plaintiff alleges that Defendants violated his right to procedural due process.  (Dkt. No. 1 at 22 ¶ 82.)  Defendants move for judgment on the pleadings dismissing this claim.  (Dkt. No. 44-1 at 6-12.)  Defendants argue that they provided Plaintiff with due process before placing him in administrative segregation and by providing periodic reviews of the placement.  *Id.*  For the reasons discussed below, I find that Plaintiff has stated a procedural due process claim as to his initial placement in administrative segregation but not as to the sufficiency of Defendants' periodic reviews.

In order to state a procedural due process claim, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).

18

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier*, 280 F.3d at 80; *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). Here, Defendants concede for the purposes of this motion that Plaintiff has alleged facts plausibly suggesting that he was deprived of a liberty interest. (Dkt. No. 44-1 at 5.) The issue, then, is whether Defendants provided Plaintiff with due process (1) before making the initial decision to place Plaintiff in administrative segregation; and (2) before deciding to retain Plaintiff in administrative segregation.

Before being placed in administrative segregation, due process requires that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation ." *Hewitt v. Helms*, 459 U.S. 460, 476 (1983).[4] This "opportunity to present his views" need not be as formal as the proceedings held in connection with disciplinary charges, which must comply with the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974).[5]

---

[4]     *Hewitt*'s analysis of the proper method for determining whether an inmate has been deprived of a liberty interest was overruled by *Sandin v. Conner*, 515 U.S. 472 (1995). However, *Hewitt* "remain[s] instructive for [its] discussion of the appropriate level of procedural safeguards." *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005).

[5]     These requirements include (1) advanced written notice of the charges; (2) a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff*, 418 U.S. at 563-67; *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). In some circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will

*Soto v. Walker,* 44 F.3d 169, 172 n.3 (2d Cir. 1995).  Rather, "[o]fficials must conduct 'an informal, nonadversary evidentiary review' of the information in support of the prisoner's administrative confinement, and the 'proceeding must occur within a reasonable time following an inmate's transfer.'" *Soto,* 44 F.3d at 172 (quoting *Hewitt,* 459 U.S. at 476 n.8).

Defendants cite *Soto* for the proposition that the informal evidentiary review required to satisfy due process must occur "within a reasonable time following an inmate's transfer." (Dkt. No. 44-1 at 6.)  However, Defendants' brief does *not* note that the Second Circuit held in *Soto* that "[t]he failure to provide informal review procedures within even as short a time as seven days in connection with a transfer into administrative confinement states a due process claim." *Soto*, 44 F.3d at 172.  Here, there was a ten-day delay between the recommendation that Plaintiff be placed in administrative segregation and the hearing conducted by Defendant Drown. Accordingly, Plaintiff has stated a claim that his initial placement in administrative segregation violated his right to procedural due process.  Therefore, I recommend that the Court deny Defendants' motion to dismiss the procedural due process claim regarding Plaintiff's initial placement in administrative segregation.[6]

After an inmate has been placed in administrative segregation, due process requires only that "administrative segregation may not be used as a pretext for indefinite confinement of an

_____

be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense. *Wolff*, 418 U.S. at 570.

[6]    Despite noting in the "Statement of the Case" section of their brief that "some defendants are alleged to have been personally involved while others are gathered in upon a theory of conspiracy or by virtue of their supervisory capacities," Defendants have not argued that any Defendant should be dismissed for lack of personal involvement.  (Dkt. No. 44-1 at 3.) Nor do Defendants argue that any Defendant is entitled to qualified immunity.

inmate.  Prison officials must engage in some sort of periodic review" of the placement.  *Hewitt*, 459 U.S. at 477 n.9.  This review may rely on "purely subjective evaluations and on predictions of future behavior."  *Id*. at 474.  Periodic reviews should be "substantive and legitimate, not merely a 'sham.'"  *Giano v. Kelly*, 869 F. Supp. 143, 150 (W.D.N.Y. 1994).  A review is "substantive and legitimate" where the prisoner has an opportunity to relay information or make a statement to the individuals conducting the review and there is some indication that the information is actually considered.  *See Edmonson v. Coughlin*, 21 F. Supp. 2d 242, 253-54 (W.D.N.Y. 1998) (prisoner's ability to submit information, combined with his ultimate release from administrative segregation, showed that reviews, while "flawed," were "meaningful.").

Here, Defendants conducted periodic reviews of Plaintiff's administrative segregation status.  Plaintiff availed himself of the opportunity to express his views to the facility and Central Office committees.  The complaint and the attachments thereto show that the committees considered the information Plaintiff submitted.  Therefore, Plaintiff has failed to state a procedural due process claim regarding his retention in administrative segregation.  Accordingly, I recommend that the Court dismiss the procedural due process claim regarding Plaintiff's retention in administrative segregation.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citation omitted).  Plaintiff here has not had an opportunity to amend his complaint.  Accordingly, I recommend that the procedural due process claim regarding Plaintiff's retention in administrative segregation be dismissed with leave to amend.

21

**B.      Substantive Due Process Claim**

Construed liberally, the complaint may assert that Defendants violated Plaintiff's right to substantive due process.  (Dkt. No. 1 at 22 ¶ 82.)  Defendants acknowledge that the complaint may include a substantive due process claim (Dkt. No. 44-1 at 5 n.2), but do not explicitly address the elements of such a claim.  I recommend that the Court dismiss any substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, . . . conscience-shocking, . . . or oppressive in a constitutional sense, . . . but not against constitutional action that is incorrect or ill-advised."  *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation marks and citations omitted).  Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process.  In *Sandin v. Conner*, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs.  *Sandin v. Conner*, 515 U.S. 472,  479 n.4, 484 (1995).  Here, neither Plaintiff's administrative segregation status nor the conditions of confinement that he alleges are conscience-shocking or oppressive in the constitutional sense. Therefore, I recommend that the Court dismiss Plaintiff's substantive due process claim with leave to amend.

**C.      Equal Protection Claim**

Plaintiff alleges that Defendants violated his right to equal protection.  (Dkt. No. 1 at 22 ¶ 82.)  Defendants acknowledge that the complaint includes an equal protection claim (Dkt. No. 44-1 at 5 n.2), but do not explicitly address the elements of such a claim.  I recommend that the Court dismiss Plaintiff's equal protection claim with leave to amend.

22

The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).  Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment."  *Id*. (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

Here, because Plaintiff does not assert that he is a member of a suspect class or that Defendants inhibited his exercise of a fundamental right[7], Plaintiff's equal protection claim is properly classified as a "class-of-one" claim.  It is extremely difficult for class-of-one plaintiffs to allege facts plausibly suggesting that they were treated differently from similarly situated

---

[7]     Prisoners do not have a fundamental right to be free from administrative segregation.  *Brown v. Nix*, 33 F.3d 951, 954 (8th Cir. 1994). ; *Matthews v. Wiley*, __ F. Supp. 2d. __, No. 09-CV-00978, 2010 WL 3703357, at * 11 (D. Colo. Sept. 13, 2010).

individuals.  "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006.)

The only allegation in Plaintiff's complaint that even remotely suggests the existence of any similarly situated individual is the allegation that Defendant Drown told Plaintiff that "Plaintiff would only be held in Administrative Segregation Confinement for approx[imately] six . . . months, then released to the Close Supervision Unit . . . as he ha[d] seen happen to another inmate . . . [who] had a very similar case and record as the Plaintiff's."  (Dkt. No. 1 at 13 ¶ 40.) This vague allegation is insufficient to state a claim under the rigorous class-of-one standard. Therefore, I recommend that the Court dismiss Plaintiff's equal protection claim with leave to amend.

### D.    Eighth Amendment Claim

Plaintiff alleges that Defendants violated his Eighth Amendment rights.  (Dkt. No. 1 at 26 ¶ 95.)  Defendants argue that this claim should be dismissed because "beyond his displeasure with the regular attributes of the SHU, [P]laintiff does not claim that he suffered any deprivations which posed any unreasonable risk to his health or which have otherwise violated contemporary standards of decency."  (Dkt. No. 44-1 at 14.)  Defendants do not discuss Plaintiff's allegations regarding the persistent problem of inmates throwing feces and of feces being smeared on the recreation cages.  (Dkt. No. 1-2 at 31-32, 34.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In fulfilling this duty, prison officials must "ensure that inmates receive

24

adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468

U.S. 517, 526-27 (1984)).

There are two components of an Eighth Amendment claim: an objective component and a

subjective component.  To prove the objective component of an Eighth Amendment conditions

of confinement claim, a prisoner must show that the defendant's "act or omission . . . result[ed]

in the denial of the minimal civilized measure of life's necessities."  *Farmer*, 511 U.S. at 834.

Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim."

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  To satisfy the subjective component of an Eighth

Amendment conditions-of-confinement claim, the plaintiff must show that the defendant acted

with "deliberate indifference."  *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  A prison official

demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of

and disregards an excessive risk to inmate health or safety; the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Defendants argue that Plaintiff has failed to state a claim as to the objective component of

his Eighth Amendment claim.  In support of that argument, Defendants cite only *Rudolph v.

Goord*, No. 9:01-CV-1549, 2005 WL 1630022 (N.D.N.Y. Jul. 11, 2005).  In *Rudolph*, Magistrate

Judge Peebles and Senior District Court Judge Scullin found that an inmate who alleged that "the

conditions he faced within the SHU included severe mice and bat infestation, with resulting feces

in his clothing, bed, and cell; inadequate clothing for outdoor recreation; and garbage and human

feces in the gallery area outside his cell" had stated an Eighth Amendment claim.  *Rudolph*, 2005

25

WL 163002,  at *5.  Defendants' brief simply cites *Rudolph* without comparing or contrasting the facts of that case with the allegations in Plaintiff's complaint.

A general allegation that a prisoner was subjected to "unclean" conditions, without more particularized allegations of fact, is insufficient to state a conditions of confinement claim.  *See Williams v. Carbello*, 666 F. Supp. 2d 373, 379 (S.D.N.Y. 2009).  I find, however, that Plaintiff's allegations that there were "human feces smeared all over the rec cages" over a period of several months and that he had to "smell and breath[e] in the atrocious odor of feces being thrown" are sufficient to plausibly suggest that Plaintiff was subjected to unconstitutional conditions of confinement.  *See Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (finding that triable issue of fact existed where prisoner alleged that he was, *inter alia*, exposed to human feces in his cell).  Although Plaintiff's allegations are not as severe as those described in *Gaston* or *Rudolph*, they are sufficient to plausibly suggest that the conditions to which he was exposed were sufficiently "serious" to satisfy the objective prong of his Eighth Amendment claim.

Defendants do not argue that Plaintiff has failed to state a claim regarding the subjective prong of his Eighth Amendment claim.  Nor do they argue that Plaintiff has failed to sufficiently allege that Defendants were personally involved in the alleged constitutional violation.  Nor do they argue that they are entitled to qualified immunity.  Therefore, I recommend that the Court deny Defendants' motion to dismiss Plaintiff's Eighth Amendment conditions of confinement claim.

### E.  Conspiracy

Plaintiff alleges that Defendants conspired against him, thus violating 42 U.S.C. § 1983.  (Dkt. No. 1 at 1 ¶ 1, 28 ¶ 101.)  Defendants argue that this claim should be dismissed because (1)

Plaintiff has not alleged any facts plausibly suggesting that Defendants committed any overt act in furtherance of the alleged conspiracy; (2) Plaintiff has not alleged any facts plausibly suggesting a meeting of the minds for an unlawful purpose; and (3) it is barred by the intra-corporate conspiracy doctrine. (Dkt. No 44-1 at 12-13.) I will address only Defendants' third argument, as it is dispositive.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York*, No. 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5-6, 1999 WL 151702, at *2 (W.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 442 (N.D.N.Y. 2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *Girard v. 94th and Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[8] The

---

[8]    *See Sebast v. Mahan*, No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, at *7-8, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 442 (N.D.N.Y. 2009); *Lukowski v. County of Seneca*, No. 08-CV-6098, 2009 U.S. Dist. LEXIS 14282, at *42-44, 2009 WL 467075, at *3 (W.D.N.Y. Feb. 24, 2009); *Perrin v. Canandaigua City School Dist.*, No. 08-CV-6153L, 2008 U.S. Dist. LEXIS 95280, at *4-5, 2008 WL 5054241, at *2 (W.D.N.Y. Nov. 21, 2008); *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 200-01 (E.D.N.Y. Feb. 11, 2008); *Crews v. County of Nassau*, No. 06-CV-2610, 2007 U.S. Dist. LEXIS 94599, at *41-42, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York*, 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007); *Clark v. City of Oswego*, No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, at *22-25, 2007 WL 925724, at *7 (N.D.N.Y. March 26, 2007); *Malone v. City of New York*, No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, at *32, 2006 WL 2524197, at *11 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M&T Bank*, No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, at *42-45, 2006 WL 839547, at *11-12 (N.D.N.Y. Mar. 27, 2006).

district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983

without discussing whether it was appropriate to do so.

In *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d 602, 604

(S.D.N.Y. 2006), the Southern District squarely held that the intracorporate conspiracy doctrine

should be applied to § 1983 cases.  Like that Court, in the absence of any authority to the

contrary, I

> will continue to apply the intracorporate conspiracy doctrine to
> Section 1983 claims because the doctrine's logic is sound.  A civil
> rights conspiracy requires an agreement between two or more actors
> to inflict an unconstitutional injury.  This 'two or more actors'
> requirement cannot be satisfied where all of the alleged conspirators
> are employees of a single entity and acting within the scope of their
> employment[9] as agents of that entity.

*Id.* (citation omitted).  Here, Defendants are all DOCS employees and there is no allegation that

they were not acting within the scope of their employment.  Therefore, Plaintiff's conspiracy

claimed is barred by the intracorporate conspiracy doctrine and I recommend that it be dismissed

---

[9] Even where the intracorporate conspiracy doctrine applies, there is an exception to the
doctrine where "individuals pursue personal interests wholly separate and apart from the entity."
*Orafan v. Goord*, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006) (citation and quotation marks
omitted), *vacated and remanded on other grounds*, *Orafan v. Rashid*, No. 06-2951, 249 Fed.
Appx. 217 (2d Cir. Sept. 28, 2007).   I have previously found that a triable issue of fact exists
regarding whether officers acted pursuant to their personal interests where a prisoner alleges that
officers assaulted him in retaliation for participating in a federal lawsuit.  *Medina v. Hunt*, No.
9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008).
Other courts have found that the personal interest exception applies, and thus allowed conspiracy
claims to proceed, where it was alleged that officers conspired to cover up their use of excessive
force.  *Hill v. City of New York*, No. 03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL
3591719, at *6 (E.D.N.Y. Dec. 30, 2005).  Here, Plaintiff does not allege that any of the
Defendants engaged in excessive force or that they were pursuing personal interests wholly
separate and apart from their DOCS employment.  Therefore, the exception is inapplicable.

with leave to amend.

    **ACCORDINGLY**, it is

    **RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 44)

be **GRANTED IN PART AND DENIED IN PART**.  It is recommended that the Court dismiss

(1) the procedural due process claim regarding the retention of Plaintiff in administrative

segregation; (2) the substantive due process claim; (3) the equal protection claim; and (4) the

conspiracy claim, all with leave to amend.  It is recommended that the Court deny the motion as

to (1) the procedural due process claim regarding Plaintiff's original placement in administrative

segregation; and (2) Plaintiff's Eighth Amendment conditions of confinement claim.

    Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated:  March 25, 2011
       Syracuse, New York

                                 George H. Lowe
                                 United States Magistrate Judge

29