UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL SAMMS,

                                 Plaintiff,
                                                      9:10-CV-0349
v.                                                    (GTS/TWD)

BRIAN FISCHER, LUCIEN J. LECLAIRE, JR.,
S. B. DUNCAN, NORMAN BEZIO, JAMES FERRO,
H. REINHOLD, MICHAEL HOGAN,
ESTATE OF CURTIS DROWN,
DALE ARTUS, S. E. RACETTE,
JOSEPH P. PORCELLI,

                                 Defendants.
_____

APPEARANCES:                          OF COUNSEL:

MICHAEL SAMMS, 07-A-4065
Plaintiff *pro se*
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN           CHARLES J. QUACKENBUSH, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## **REPORT-RECOMMENDATION and ORDER**

          This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff

Michael Samms alleges that Defendants violated his constitutional rights by placing him in

administrative segregation at Clinton Correctional Facility and subjecting him to unsanitary

conditions of confinement.[1]  (Dkt. No. 1.)  Currently pending before the Court is Defendants'

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 76.)

For the reasons that follow, I recommend that the Court (1) grant the motion as to all claims

against Defendant Fischer and as to Plaintiff's Eighth Amendment conditions of confinement

claims; and (2) deny the motion as to the procedural due process claims against Defendants

LeClaire, Duncan, Bezio, the Estate of Curtis Drown, Artus, and Racette.[2]

## I.     BACKGROUND

Plaintiff began serving his current sentence in the New York Department of Corrections

and Community Supervision ("DOCCS") system on July 26, 2007.  (Dkt. No. 1 at 10 ¶ 17.[3])  He

was housed in the general population at Downstate Correctional Facility.  *Id.* at 11 ¶ 19.

On January 11, 2008, Plaintiff was transferred to Clinton Correctional Facility.  *Id.* ¶ 21.

Plaintiff was escorted directly to the Special Housing Unit ("SHU"), an area of the prison in

which inmates are confined to a cell for twenty-three hours a day and deprived of many of the

---

[1]      In response to Defendants' motion for judgment on the pleadings (Dkt. No. 44),
the Court dismissed Plaintiff's (1) procedural due process claim regarding the decisions to retain
him in administrative segregation; (2) substantive due process claims; (3) equal protection
claims; and (4) conspiracy claims with leave to amend.  (Dkt. No. 71.)  Plaintiff did not amend
his complaint despite receiving an extension of time in which to do so.  (Text Order Sept. 30,
2011.)  Accordingly, the claims were dismissed with prejudice.  (Text Order Nov. 8, 2011.)

[2]      Plaintiff's allegations against Defendants Ferro, Reinhold, Hogan, and Porcelli
involved claims that were dismissed as a result of Defendants' motion for judgment on the
pleadings.  (Dkt. No. 71.)  The Clerk should, therefore, list these Defendants as "terminated" on
the docket.

[3]      Citations to page numbers are to the page numbers assigned by the Court's
electronic filing system.

privileges that inmates in the general population enjoy. *Id.* ¶¶ 24-28. When Plaintiff asked the area supervisor and officers why he was being placed in the SHU, they told him they were "just following orders" from Defendant Dale Artus, Superintendent of Clinton Correction Facility. *Id.* at 12 ¶ 30.

Pursuant to a written order by Defendant Deputy Superintendent of Security S. E. Racette, Plaintiff was placed in a special cell, different from the other cells in the SHU, designed for inmates who had been found guilty of throwing feces and bodily fluids. (Dkt. No. 1 at 12 ¶¶ 31-32, 34; Dkt. No. 1-1 at 1-4.) The metal mesh wire and thick fiber glass shield across the front of the cell gate prevented much air from coming into the cell, causing it to be hot, stuffy, and dry. (Dkt. No. 1 at 12 ¶ 33.) Plaintiff remained in the special cell until February 10, 2008, "although he never threw anything on a staff figure []or inmate, nor did Plaintiff ever have a misbehavior report or incident on his entire disciplinary history record that would constitute/warrant him being placed behind this special cell." *Id.* at 13 ¶ 35.

On January 12, 2008, Defendant S. B. Duncan, DOCCS Senior Investigator, recommended that Plaintiff be placed in administrative segregation. *Id.* ¶ 36. In the DOCCS system, inmates are placed in administrative segregation when it is determined that their "presence in general population would pose a threat to the safety and security of the facility." N.Y. Comp. Codes. R. & Regs. tit. 7, § 301.4(b) (2013). Pursuant to regulation, administrative segregation inmates housed in the SHU are "subject to the same rules and regulations as those disciplinary inmates who have completed 30 days of satisfactory adjustment." *Id.* at (c). Plaintiff asserts that inmates in administrative segregation cannot participate in religious worship or religious education classes, are limited to exercising one hour per day in a 9x14 cage, and

cannot possess personal underwear or socks.  (Dkt. No. 1 at 26 ¶¶ 96-97.)  Many of the inmates

in administrative segregation are seriously mentally ill, scream and bang on the cell walls, and

smear feces on the walls and floors.  *Id*. ¶ 97.

Defendant Duncan stated that his reasons for recommending administrative segregation

for Plaintiff were: (1) Plaintiff's conviction for first degree robbery, first degree assault, and

criminal possession of a weapon, for which he was serving a sentence of thirty-four to forty

years; (2) Plaintiff's guilty plea to a charge of first degree promoting prison contraband; (3)

Plaintiff's  accumulation of forty-four infractions, including eleven assaults on staff, while

confined at Rikers Island prior to entering DOCCS; (4) Plaintiff's ability to slip from handcuffs;

(5) Plaintiff's disciplinary record during an earlier DOCCS sentence at Downstate Correctional

Facility in 2001, when he accumulated nine misbehavior reports on charges ranging from violent

conduct and fighting to unauthorized organization; (6) Plaintiff's accumulation of thirty

infractions at Rikers Island in 2007, including three assaults on staff; (7) the discovery of a cell

phone and charger in Plaintiff's property at Rikers Island; (8) the 'considerable mention' of

Plaintiff by name in a 2007 New York Daily News article, which described Plaintiff as

"[t]opping the rogues gallery" in a list of sixty-five "violence-prone criminals who need extra

attention"; and (9) two 2007 misbehavior reports.  (Dkt. No. 1-1 at 5.)  Defendant Duncan

concluded that Plaintiff:

> has proven himself to be a severe management problem.  His ability
> to procure a cell phone while housed at Rikers Island [] indicates he
> has the connections to circumvent security and continue with his
> criminal behavior.  This inmate is also seen as having a certain
> influence over other incarcerated individuals he affiliates himself
> with.

*Id*.

On January 22, 2008, Defendant Curtis Drown[4] conducted an administrative segregation hearing. (Dkt. No. 1 at 13 ¶ 37.) At the beginning of the hearing, Defendant Drown told Plaintiff not to call any witnesses or make too many objections because it would just "drag out the hearing" and "it wouldn't matter anyway because he had a strict order to find Plaintiff guilty." *Id*. ¶ 39. Defendant Drown told Plaintiff "not to worry, because judging by Plaintiff's . . . disciplinary history . . . Plaintiff would only be held in Administrative Segregation Confinement for approx[imately] six . . . months, then released to the Close Supervision Unit . . ., as he had seen happen to another inmate . . . [who] had a very similar case and record as the Plaintiff's." *Id*. ¶ 40.

The hearing lasted forty-five minutes. (Dkt. No. 1 at 14 ¶ 41.) Plaintiff did not call any witnesses or make too many objections. *Id*. During the hearing, Defendant Drown considered the Daily News article to which Defendant Duncan had referred. *Id*. ¶ 43. The article stated:

> They're among the baddest of the bad, a scary crew of armed thugs who walked the city streets with violence on their minds and guns at the ready. And now they're being shadowed by the NYPD. A little more than a year after it was created, the city's gun offenders registry - the first in the nation - is tracking 65 felons, with hundreds expected to follow. Of the registrants, 21 are out of jail. And the offenders must begin reporting to the NYPD next month. The registry - proposed by Mayor Bloomberg in January 2006, signed into law last summer and launched in March - isn't meant to mimic the public warning system of sex offender registries. It's an internal NYPD roster of violence-prone criminals *who need extra attention*. Criminals land on the list when they're convicted of a weapons charge. After they're released from prison, they must meet with cops every six months for four years. Topping the rogues gallery is

---

[4]     Defendant Drown died on March 29, 2011. (Dkt. No. 66.) On July 11, 2011, the Clerk substituted the Estate of Curtis Drown as a Defendant in place of Curtis Drown. (Dkt. No. 70.) I will refer to this Defendant as "Defendant Drown" throughout this Report-Recommendation.

Michael Samms, 26 - a career criminal who blew apart a man's leg just for fun, the Daily News has learned. Samms and a pal launched the August 2005 attack while riding around downtown Brooklyn in a silver Chrysler 300. After spotting a couple who had just left a club, Samms jumped out of the car, pointed a 9-mm. Luger semiautomatic pistol at Eddie Battle Jr. and screamed, "Run your pockets!" Battle hesitated. Samms rifled through the man's pants, pulled out a wallet and got into the car. Then - just for spite - Samms stepped out and shot Battle in the thigh, slicing his femoral artery and shattering the bone. Samms was sentenced to 25 years in prison in July.

(Dkt. No. 1-1 at 8, emphasis added.)

At the conclusion of the hearing, Defendant Drown determined that Plaintiff should be placed in administrative segregation. (Dkt. No. 1 at 14 ¶¶ 42, 44.) He stated that he relied upon Plaintiff's "significant record at the New York City D.O.C.S., and [a] newspaper article describ[ing] the Plaintiff as 'needing extra attention among a population composed exclusively of felons.'" *Id.*

Plaintiff asserts that Defendant Drown acted arbitrarily and capriciously, noting in particular that "the article never stated: 'among a population composed exclusively of felons.'" *Id.* ¶¶ 43-44.

Plaintiff appealed Defendant Drown's disposition to Defendant Norman Bezio, the DOCCS Director of Special Housing and Inmate Disciplinary Program. *Id.* ¶ 45. Defendant Bezio affirmed Defendant Drown's decision on March 13, 2008. *Id.* ¶ 46.

On March 23, 2008, Plaintiff sent a letter to Defendant Bezio asking him to reconsider his decision. (Dkt. No. 1 at 15 ¶ 47.) Plaintiff sent a carbon copy to Defendant Brian Fischer, the Commissioner of DOCCS. *Id.* On March 31, 2008, Defendant Lucien J. LeClaire, Jr., the

DOCCS Deputy Commissioner of Correctional Facilities, responded to Plaintiff's letter. *Id*. ¶ 48.

The letter, which was carbon copied to Defendant Artus, stated:

> Commissioner Fischer has asked me to respond to your letter to him concerning your confinement status in Administrative Segregation at Clinton Correctional Facility. Please be advised that Departmental regulations require that a hearing be conducted to assess the reason why the segregation of a specific inmate may be necessary. A hearing was conducted and due to the serious nature of the information contained in the Administrative Segregation recommendation, your placement in Administrative Segregation was warranted. It is noted that the decision of the hearing officer was affirmed on March 13, 2008. The hearing was conducted appropriately in accordance with Departmental procedures. Your Administrative Segregation[] status continues to be reviewed periodically to determine the need for such assignment. At this time, your present placement appears appropriate.

(Dkt. No. 1-1 at 10.)

On April 4, 2008, Plaintiff wrote to Prisoner's Legal Services of New York regarding his placement in administrative segregation. (Dkt. No. 1 at 15 ¶ 49.) On April 18, 2008, Prisoner's Legal Services wrote to Defendant Bezio. *Id*. ¶ 50. The letter stated:

> Overall the recommendation for Mr. Samms' placement in Ad Seg seems like an overreaction, as it arose not by his behavior in state custody, but rather on the basis of a newspaper article. The newspaper article . . . discusses a gun offender registry created by the NYPD for the purpose of tracking offenders upon release from prison. CHO Drown notes that the article describes Mr. Samms as a "violence prone criminal needing extra attention." Reliance upon this registry seems highly irregular and inappropriate here. Moreover, it is clearly misplaced as it completely fails to consider the significant difference between needed "extra attention" while out on the street and warranting extremely restricting confinement while in prison. Gun violence and crime prevention and detection strategies on the street is one thing, appropriate custody placement within DOCS is quite another. Indeed the only "extra attention" required by the registry is to meet with police officers every six months. This pales in comparison to highly restrictive SHU confinement and all it

entails, including the lack of programming.

As well, the reliance on Mr. Samms' conduct while in jail prior to entering state custody does not provide justification for his Ad Seg placement either. Surely a maximum [security] state prison such as Clinton is much more secure than a city jail. Indeed, this is evidenced by the Ad Seg recommendation itself, which lists a total of 44 disciplinary infractions incurred during Mr. Samms' time on Rikers, as opposed to a total of 9 infractions (six of which were Tier IIs) while in DOCS custody. In addition, the city jail infractions appeared to have occurred within a two month period, yet the 9 infractions in state custody occurred over a two and a half year period. Indeed, at the time this Ad Seg recommendation was made Mr. Samms had only received two Tier II tickets in the nearly six months he had been in state custody. Clearly the diminished infraction rate in state custody reflects, at least in part, the enhanced security that NYSDOCS possesses, together with a qualitative difference in Mr. Samms' behavior and conformity with DOCS' rules and standards.

In short, Mr. Samms has not proven himself to be in need of Ad Seg placement in state custody.

(Dkt. No. 1-1 at 11-12.)

On May 13, 2008, Plaintiff wrote to Defendant Fischer regarding his placement in administrative segregation. (Dkt. No. 1 at 15 ¶ 51; Dkt. No. 1-1 at 13-16.) Defendant LeClaire responded to Plaintiff's letter. (Dkt. No. 1 at 15 ¶ 52.) He stated that:

Commissioner Fischer has asked me to respond to your letter to him concerning your confinement status in Administrative Segregation at Clinton Correctional Facility.

It should be noted that the procedures to be followed with regard to inmates assigned to Administrative Segregation are established in Directive #4933, Chapter VI, Title 7, NYCRR. All issues noted in your letter will also be considered as part of your next sixty-day review in Central Office.

I am forwarding a copy of your letter to Superintendent Artus at Clinton Correctional Facility for his information and any action deemed appropriate.

(Dkt. No. 1-1 at 17.)

On October 6, 2008, Plaintiff filed a grievance regarding unsanitary SHU conditions. (Dkt. No. 1-2 at 31-32.) He stated that "there is still human feces smeared all over the rec cages that I am being placed in. The feces are smeared on all of the rec cages - not one particular cage. It has been this way for quite a while now (a few months) . . . ." (Dkt. No. 1-2 at 31.)

On October 7, 2008, Plaintiff filed a grievance regarding excessive noise in the SHU. (Dkt. No. 1-2 at 33-34.) He stated that " [t]he loud and disturbing noise comes from all of the serious mentally ill inmates that they (DOCS) have me around . . . ." *Id*. at 33. He described the noise as "constant screaming, yelling, banging on the walls and cell gates that goes on all day thru-out (sic) a 24 hour period." *Id*. He also alleged that he had to "smell and breath[e] in the atrocious odor of feces being thrown . . . people not taking showers for weeks." *Id*. at 34.

As of the date he filed the complaint in this action (March 25, 2010), Plaintiff had been confined to administrative segregation for twenty-two months. (Dkt. No. 1 at 21 ¶ 79.)

Plaintiff alleges that Defendants violated his right to procedural due process and his rights under the Eighth Amendment. *Id*. at 22 ¶ 82, 26 ¶ 95. Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, and costs. *Id*. at 28-31.

Defendants now move for summary judgment. (Dkt. No. 76.) Plaintiff has opposed the motion. (Dkt. No. 80.) Defendants have filed a reply. (Dkt. No. 81.)

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The party moving for summary

judgment bears the initial burden of showing, through the production of admissible evidence, that

no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir.

2006).  Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Id*. at 273.  The

nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's]

pleading" or "simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 & n.11 (1986).  Rather, a

dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248

(1986).  In determining whether a genuine issue of material[5] fact exists, the Court must resolve

all ambiguities and draw all reasonable inferences against the moving party.  *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

### B.        Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of

Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion

is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of

Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure

to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnie Gen.

Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38

---

[5]        A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson*, 477 U.S. at 248.

(S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the

11

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III.    ANALYSIS

### A.    Procedural Due Process Claim Regarding Placement in Administrative Segregation

Plaintiff's procedural due process claim regarding his original placement in administrative segregation survived Defendants' motion for judgment on the pleadings. (Dkt. No. 71 at 13.) Plaintiff alleges that Defendants Artus, Racette, Duncan, Drown, Bezio, Fischer, and LeClaire each played some role in his original placement in administrative segregation. (Dkt. No. 1 at 12-15 ¶¶ 30-32, 36-37, 39, 41, 43-52.) Defendants move for summary judgment dismissing this claim. (Dkt. No. 76-1 at 5-7.) Defendants argue that (1) only Defendant Drown was personally involved; and (2) the decision to place Plaintiff in administrative segregation comported with due process. *Id.* For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment of the procedural due process claim as to Defendant Fischer but deny it as to all other Defendants.

#### 1.    Personal Involvement

Defendants argue that "[t]he only defendant with any evident control over the scheduling of plaintiff's administrative segregation hearing was Curtis Drown. To the extent that the Complaint can be construed as distributing liability for this claim to the other defendants, it must be dismissed." (Dkt. No. 76-1 at 5.) Defendants have not asserted any individualized arguments tailored to the allegations against each Defendant. I, however, will discuss each Defendant with

particularity.

a.   *Defendants Artus, Racette, and Duncan*

In his verified complaint, Plaintiff alleges that when he asked the area supervisor and his officers why he was being placed in the SHU upon his arrival at Clinton Correctional Facility, they told him they were "just following orders" from Defendant Artus.  (Dkt. No. 1 at 12 ¶ 30.) Plaintiff alleges that Defendant Racette issued a written order directing that Plaintiff be placed in a special cell in the SHU.  *Id.* ¶¶ 31-32, 34.  Plaintiff alleges that Defendant Duncan issued the initial recommendation that Plaintiff be placed in administrative segregation.  *Id.* at 13 ¶ 36.

Defendants have not advanced any personal involvement arguments explicitly addressing Defendants Artus, Racette, or Duncan.  (Dkt. No. 76-1.)  However, they are presumably covered by Defendants' blanket statement that "[t]o the extent that the Complaint can be construed as distributing liability for this claim to the other defendants, it must be dismissed."  (Dkt. No. 76-1 at 5.)  I recommend that the Court reject Defendants' argument.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.  *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431,

435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210

(2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely

because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

Rather, supervisory personnel may be considered personally involved if they (1) directly

participated in the violation, (2) failed to remedy that violation after learning of it through a

report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation

occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or

(5) exhibited deliberate indifference to the rights of inmates by failing to act on information

indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)

(citations omitted).[6]

Here, Plaintiff alleges in his verified complaint that Defendant Artus directly participated

in the alleged constitutional violation by ordering that he be placed in the SHU upon his arrival at

Clinton Correctional Facility. (Dkt. No. 1 at 12 ¶ 30.) He alleges that Defendant Racette was

responsible for placing him in a special cell in the SHU pending his administrative segregation

decision. *Id*. ¶¶ 31-32, 34. He alleges that Defendant Duncan issued the administrative

segregation recommendation. *Id*. at 13 ¶ 36. Defendants have not disputed these facts in either

their memorandum or law or in their statement of facts. Defendants have not produced any

---

[6]     In *Iqbal*, the Supreme Court ruled that where the underlying constitutional claim
is a claim of intentional discrimination, a supervisory official's liability must be judged by the
official's purpose rather than the official's knowledge of subordinates' actions or policies. 556
U.S. at 677. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the
*Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal*
nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44
(S.D.N.Y. 2009) (collecting cases). I will assume for the purposes of this motion that *Colon*
remains good law.

evidence that Defendant Artus did not order that Plaintiff be placed in the SHU, that Defendant Racette did not order that Plaintiff be placed in the special cell, or that Defendant Duncan did not draft the administrative segregation recommendation.  Therefore, Defendants have not established that they are entitled to a finding, as a matter of law, that Defendants Artus, Racette, and Duncan lacked personal involvement.  Therefore, I recommend that the Court deny Defendants' motion on this ground.

        b.    *Defendant Bezio*

Plaintiff alleges that Defendant Bezio affirmed Defendant Drown's administrative segregation decision and did not reconsider his decision despite letters from Plaintiff and Prisoner's Legal Services.  (Dkt. No. 1 at 14-15 ¶¶ 45-47, 50.)  Defendants have not advanced any personal involvement arguments explicitly addressing Defendant Bezio.  (Dkt. No. 76-1.)  However, he is presumably covered by Defendants' blanket statement that "[t]o the extent that the Complaint can be construed as distributing liability for this claim to the other defendants, it must be dismissed."  (Dkt. No. 76-1 at 5.)  For the reasons discussed below, I find that Plaintiff has raised a triable issue of fact that Defendant Bezio was personally involved.

The second *Colon* category -- that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal -- applies only to situations where an alleged violation is ongoing, not to situations involving a one-time violation.  *See Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("It has been held that an appropriate guiding principle for determining personal responsibility is where a grievance alleges an ongoing constitutional violation, the supervisory official who reviews the grievance is personally involved if he is confronted with a situation that he can remedy directly. If the official is confronted with a

violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation.") (internal quotation marks and citations omitted); *See also Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member.").

District courts in the Second Circuit disagree about whether simply affirming an allegedly unconstitutional disciplinary decision constitutes personal involvement. Courts declining to find personal involvement conclude that there is no "ongoing" violation for the supervisory official to "remedy" in such a situation. *See Jamison v. Fischer*, No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, at *14-15, 2012 WL 4767173, at *5 (S.D.N.Y. Sept. 27, 2012) ("Despite the fact that Plaintiff continued to be housed in the SHU, Bezio's involvement and review of the matter was distinct from whatever took place at the hearing, and he cannot be held liable . . . for violations that occurred at the hearing and were not ongoing."). *See also Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009); *Chavis v. vonHagn*, No. 02-CV-0119, 2009 U.S. Dist. LEXIS 6871, at *198-99, 2009 WL 236060, at *68 (W.D.N.Y. Jan. 30, 2009); *Odom v. Calero*, No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, at *16-20, 2008 WL 2735868, at *6-7 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord*, No. 05-CV-47A, 2005 U.S. Dist. LEXIS

42953, at *18-20, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005).

Other district courts in this circuit have found personal involvement where a supervisory official affirms an allegedly constitutionally infirm hearing decision. *See Thomas v. Calero*, 824 F. Supp. 2d 488, 509-10 (S.D.N.Y. 2011); *Holmes v. Fischer*, 764 F. Supp. 2d 523, 540 (W.D.N.Y. 2011); *Rodriguez v. Selsky*, No. 9:07-CV-0432, 2010 U.S. Dist. LEXIS 23813, 2010 WL 980273, at *6 (N.D.N.Y. Mar. 15, 2010); *Baez v. Harris*, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007); *Johnson v. Coombe*, 156 F. Supp. 2d 273, 278 (S.D.N.Y. 2001)  These courts find that there is an "ongoing" violation because having the power to vacate an allegedly unconstitutional decision, refusing to do so, and allowing an inmate to remain in the SHU  "knowingly continu[es] a deprivation of liberty without due process of law." *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, at *27, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011).

I agree with Magistrate Judge David E. Peebles that the cases finding personal involvement in such situations  "appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement." *Bennett v. Fischer*, No. 9:09-CV-1236, 2010 U.S. Dist. LEXIS 139587, at *38-39, 2010 WL 5525368, at *12 (N.D.N.Y. Aug. 17, 2010).  Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Defendant Bezio on personal involvement grounds.[7]

    c.   *Defendant Fischer*

Plaintiff alleges that he sent Defendant Fischer a letter directly and a carbon copy of his

---

[7]    The Court will provide Plaintiff with a copy of all of the unpublished decisions cited in this section in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

letter to Defendant Bezio, both of which disputed his confinement in administrative segregation. (Dkt. No. 1 at 15 ¶¶ 47, 51.)  Defendant LeClaire responded to these letters at Defendant Fischer's request.  (Dkt. No. 1-1 at 10, 17.)  I find that Defendant Fischer is entitled to summary judgment dismissing the claims against him on personal involvement grounds.  A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement.  *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *see also Wright v. Genovese*, 694 F. Supp. 2d 137, 161 (N.D.N.Y. 2010).  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendant Fischer for lack of personal involvement.

### d.    *Defendant LeClaire*

Plaintiff alleges that Defendant LeClaire responded to letters that Plaintiff sent to other DOCCS officials in which Plaintiff disputed his administrative segregation.  (Dkt. No. 1-1 at 10, 17.)  Defendants have not advanced any personal involvement arguments explicitly addressing Defendant LeClaire.  (Dkt. No. 76-1.)  However, he is presumably covered by Defendants' blanket statement that "[t]o the extent that the Complaint can be construed as distributing liability for this claim to the other defendants, it must be dismissed."  (Dkt. No. 76-1 at 5.)  For the reasons discussed below, I find that Plaintiff has raised a triable issue of fact that Defendant LeClaire was personally involved.

Receiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement.  *Shomo v. City of New York*, 579 F.3d 176, 184 (2d Cir. 2009).  However, district court decisions in this Circuit have established that

> where a supervisor receives an inmate grievance or other complaint
> and responds to it, the supervisor may be liable . . . . At first glance,
> these holdings might seem counter-intuitive, as giving supervisors an
> incentive to inaction in order to avoid personal liability. However, it
> must be noted that the Commissioner and individual prison
> Superintendents receive innumerable letters and other forms of
> inmate complaints and delegate subordinates to handle them. Thus,
> if mere receipt of a letter or similar complaint were enough, without
> more, to constitute personal involvement, it would result in liability
> merely for being a supervisor, which is contrary to the black-letter
> law that § 1983 does not impose *respondeat superior* liability.

*Walker v. Pataro*, No. 99 CIV. 4607, 2002 U.S. Dist. LEXIS 7067, at *42-43, 2002 WL 664040, at *12-13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions).[8] Here, the evidence shows that Defendant LeClaire actually responded to Plaintiff's letters. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Defendant LeClaire for lack of personal involvement.

2.     Merits

Plaintiff claims that Defendants violated his right to procedural due process when they placed him in administrative segregation. Defendants move for summary judgment dismissing this claim on the constitutional merits. (Dkt. No. 76-1 at 7.) For the reasons discussed below, I recommend that the Court deny Defendants' motion.

In order to state a procedural due process claim, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000). Defendants do not dispute that Plaintiff was deprived of a

---

[8]     The undersigned will provide a copy of this unpublished decision to Plaintiff.

liberty interest.  This action, thus, hinges on whether Plaintiff received the process to which he was due.

Due process requires that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation" before he is placed in administrative segregation.  *Hewitt v. Helms*, 459 U.S. 460, 476 (1983).[9]  This "opportunity to present his views" need not be as formal as the proceedings held in connection with disciplinary charges, which must comply with the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974).[10]  *Soto v. Walker,* 44 F.3d 169, 172 n.3 (2d Cir. 1995).  Rather, "[o]fficials must conduct 'an informal, nonadversary evidentiary review' of the information in support of the prisoner's administrative confinement, and the 'proceeding must occur within a reasonable time following an inmate's transfer.'" *Soto,* 44 F.3d at 172 (quoting *Hewitt*, 459 U.S. at 476 n.8).  Although a hearing is not required under the federal constitution, New York regulations provide inmates

---

[9]     *Hewitt*'s analysis of the proper method for determining whether an inmate has been deprived of a liberty interest was overruled by *Sandin v. Conner*, 515 U.S. 472 (1995). However, *Hewitt* "remain[s] instructive for [its] discussion of the appropriate level of procedural safeguards."  *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005).

[10]     These requirements include (1) advanced written notice of the charges; (2) a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken*.  Wolff*, 418 U.S. at 563-67; *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).  In some circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense.  *Wolff*, 418 U.S. at 570.

with the right to a hearing within fourteen days of the initial administrative segregation recommendation.  N.Y. Comp. Codes R. & Regs. tit. 7, § 301.4(a) (2013).

This Court, in denying Defendants' motion for judgment on the pleadings, focused exclusively on the lapse of time between Defendant Duncan's administrative segregation recommendation and Defendant Drown's hearing.  (Dkt. No. 61 at 20.[11])  Probably because of that focus by the Court, Defendants' memorandum of law in support of the motion for summary judgment focuses exclusively on the "reasonable time" prong of the *Hewitt* test.  (Dkt. No. 76-1 at 7; Dkt. No. 81.)  Defendants argue that Plaintiff's due process rights were not violated because Defendant Drown "conducted and concluded the hearing well within the period prescribed by regulation."  (Dkt. No. 76-1 at 7.)

Defendants do not address, however, whether the hearing provided Plaintiff with "an opportunity to present his views" as required by *Hewitt*.  Defendants' statement of material facts does not include any details about the hearing that Defendant Drown conducted.  (Dkt. No. 76-2.)  Rather, it simply states that the hearing occurred.  *Id*. ¶¶ 6-7.  The record does not contain a copy of the hearing transcript.  It does not contain any version other than Plaintiff's of what transpired at the hearing.  Defendants have not, therefore, shown that they are entitled to judgment as a matter of law on the merits of Plaintiff's procedural due process claim.

Even if Defendants had presented evidence regarding the sufficiency of the hearing, they would not be entitled to summary judgment because Plaintiff has raised a triable issue of material

---

[11]    "[T]he Second Circuit held in *Soto* that '[t]he failure to provide informal review procedures within even as short a time as seven days in connection with a transfer into administrative confinement states a due process claim.'  *Soto*, 44 F.3d at 172.  Here, there was a ten-day delay between the recommendation . . . and the hearing . . . ."

fact. Plaintiff declares that Defendant Drown "bluntly stated to Plaintiff that he . . . had a strict order to find Plaintiff guilty." (Dkt. No. 80 at 3.) Plaintiff declares under penalty of perjury that Defendant Drown instructed him not to call any witnesses or make too many objections. *Id.* at 26. Record evidence shows that Plaintiff did not, indeed, request or call any witnesses.[12] (Dkt. No. 76-5 at 53, 60.) Viewed in the light most favorable to Plaintiff, these facts raise a triable issue that Plaintiff did not receive the "opportunity to express his views" required by *Hewitt*. Therefore, I recommend that the Court deny Defendants' motion for summary judgment and allow Plaintiff's procedural due process claim to proceed against Defendants LeClaire, Duncan, Bezio, Drown, Artus, and Racette.

### B. Eighth Amendment Conditions of Confinement Claims

Read broadly, the complaint asserts Eighth Amendment claims regarding the conditions of confinement in the SHU cell to which Plaintiff was confined upon his arrival at Clinton Correctional Facility and in the cell to which he was placed after his initial administrative segregation hearing. (Dkt. No. 1 at 12 ¶¶ 31-32, 34; Dkt. No. 1-1 at 1-4, 31-34.) Defendants move for summary judgment dismissing these claims on the grounds that Plaintiff has failed to allege the personal involvement of any named Defendant and/or has not raised a triable issue of fact as to the merits. (Dkt. No. 76-1 at 8-9.) Defendants are correct.

---

[12] The record shows that Plaintiff did not ask his assistant to interview any potential witnesses in the days leading up to the hearing. (Dkt. No. 76-5 at 55.) This evidence could, of course, support an inference that it was not Defendant Drown's alleged threat that deterred Plaintiff from calling witnesses. However, it is up to a jury, not the Court, to draw credibility determinations from potentially conflicting evidence. *Anderson*, 477 U.S. at 255; *see also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

Regarding the initial confinement in the special SHU cell, Plaintiff has raised a triable issue of fact that Defendant Racette was personally involved. (Dkt. No. 1 at 12 ¶ 34.) However, Plaintiff has not raised a triable issue of fact as to the merits.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

To establish an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id*. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The prisoner must show that the defendant's "act or omission . . . result[ed] in the denial of 'the minimal civilized measure of life's necessities.'" *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

Here, Plaintiff has alleged no such conditions. He alleges only that the cell was hot, stuffy, and dry. (Dkt. No. 1 at 12 ¶ 33.) Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claim regarding the special SHU cell in which he was originally placed at Clinton Correctional Facility.

Regarding conditions in the cell in which Plaintiff was placed after the initial administrative segregation hearing, Plaintiff does not allege that any named Defendant was responsible for the conditions. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment conditions of confinement claims regarding this placement.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 76) be **<u>GRANTED IN PART AND DENIED IN PART</u>**. It is recommended that the Court dismiss (1) all claims against Defendant Fischer; and (2) Plaintiff's Eighth Amendment conditions of confinement claims. It is recommended that the procedural due process claim proceed against Defendants LeClaire, Duncan, Bezio, the Estate of Curtis Drown, Artus, and Racette; and it is further

**RECOMMENDED** that the Clerk terminate Defendants Ferro, Reinhold, Hogan, and Porcelli from the docket because all claims against those Defendants were dismissed in response to Defendants' motion for judgment on the pleadings; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Walker v. Pataro*, No. 99 CIV. 4607, 2002 U.S. Dist. LEXIS 7067, 2002 WL 664040 (S.D.N.Y. Apr. 23, 2002); *Jamison v. Fischer*, No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, 2012 WL 4767173 (S.D.N.Y. Sept. 27, 2012); *Chavis v. vonHagn*, No. 02-CV-0119, 2009 U.S. Dist. LEXIS 6871, 2009 WL 236060 (W.D.N.Y. Jan. 30, 2009); *Odom v. Calero*, No. 06. Civ. 15527, 2008 U.S. Dist. LEXIS 52408, 2008 WL 2735868 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord*, No. 05-CV-47A, 2005 U.S. Dist. LEXIS 42953, 2005 WL 2000144 (W.D.N.Y. Aug. 15, 2005); *Rodriguez v. Selsky*,

No. 9:07-CV-0432, U.S. Dist. LEXIS 23813, 2010 WL 980273 (N.D.N.Y. Mar. 15, 2010); *Baez v. Harris*, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728, 2007 WL 446015 (N.D.N.Y. Feb. 7, 2007); *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, 2011 WL 1842294 (S.D.N.Y. May 9, 2011); and *Bennett v. Fischer*, No. 9:09-CV-1236, 2010 U.S. Dist. LEXIS 139587, 2010 WL 5525368 (N.D.N.Y. Aug. 17, 2010) in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: February 28, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge